THE FIRST NATIONAL BANK OF JOLIET

*v.*

WILLIAM ADAM *et al.*

*Filed at Ottawa October 31, 1891.*

1. REAL ESTATE—*mill, machinery and storehouse on leased ground.* After the execution of a lease, a paper-mill building was erected by the lessee, the upper part of which was built on the stone foundations of an old mill, and the lower part rested partly on stone foundations built upon the ground, and partly on posts planted in the bed of a river. The upper part was 30 by 40 feet, and two stories high, and the lower part was 24 by 90 feet, and had only one story, and connected with the latter, and resting upon the ground, was a building used as a bleach-room. There was also a storehouse built upon posts set in the ground. The paper machines, boilers, etc., were all attached to the structure: *Held,* that the structure, though capable of removal, constituted a part of the freehold until severed.

2. In such case, the mill and buildings and the machinery all formed a part of the leasehold estate, and they, together with the lease, were chattels real, and were a proper subject matter of a real estate mortgage, which, when made, would create a valid lien on the same.

3. SAME—*changing character of property by agreement.* Parties to a lease or other agreement can not, by treating buildings, etc., on demised premises, which are part of the freehold, as personal property, affect the rights of third persons, and, as to them, convert such property into personal estate. The real estate or chattels real can not, by agreement between parties, be changed into personalty, so as to affect or change the rights of third persons, except by way of a chattel mortgage properly acknowledged and recorded.

4. LIEN FOR RENT—*lessee's buildings, machinery, etc.—priority of liens.* A lease for a term of years provided for the reservation of a valid and first lien to the lessor upon "any and all goods, chattels or other property belonging to" the lessee, as security for the rent named therein, after the execution of which lease the lessee erected buildings upon the premises, and attached machinery, boilers, etc., to the same. After this the lessee gave a deed of trust upon the leasehold estate: *Held,* that the lessor acquired no lien upon the buildings, etc., superior to the lien of the trust deed.

5. A clause in a lease for a term of years, "meaning and intending hereby to give the said party of the first part, his heirs, etc., a valid and first lien upon any and all goods, chattels or *other property* belonging"

to the said party of the second part, as security for the payment of said rent," will not create a lien on buildings, machinery and fixtures subsequently erected upon the demised premises.

6. Same—*words creating—too indefinite.* The words in that part of a lease which attempt to create a lien for rent, "or other property," are too indefinite as a description of after acquired property to charge third persons with notice of an equitable mortgage thereon. The rule that the description must be sufficiently specific to afford third persons the means of identifying the property, refers to chattel mortgages as well as to mortgages of land.

7. Construction—*general words following a series.* The words "or other property," mean such other personal property as might be the subject matter of a distress for rent. They will be restricted to a meaning analogous to the meaning of the preceding words, "goods" and "chattels."

8. It is a rule of construction, that general and specific words which are capable of an analogous meaning, being associated together, take color from each other, so that the general words shall be restricted to a sense analogous to the less general.

9. Distress for rent—*extent of lien.* A landlord having no lien under his lease may subject the goods and chattels of the tenant to sale for rent by distress, and when, after such distress, executions are levied on the same property subject to the distress, he will be limited by his judgment, and can not hold any surplus of the goods distrained, after satisfaction of his judgment, for the payment of rents accruing after the levy of his distress, as against the executions.

10. Same—*before rent due.* Under the statute, where the tenant abandons the demised premises, growing crops may be seized, whether the rent is due or not, but otherwise property can not be taken under a distress warrant except for rent due.

11. Same—*statutory or common law lien.* Independently of the provisions of a lease, a landlord in this State has no common law lien upon the property of his tenant for rent, and he has no statutory lien except as to growing crops.

12. Lease—*recording—effect of, as notice.* The recording of a lease for a term of years, although it is not acknowledged, will operate as notice to subsequent purchasers and incumbrancers, of the existence of the lease, and of the rights of the lessor thereby conferred or secured.

13. Promissory note—*rights of pledgee in possession, against secret equities.* A bank allowed the pledgor of notes, who was the maker and also the payee, to take the same, in order that he might sell them if he could, and apply the proceeds of the sale on his indebtedness to the bank. The debtor, instead of selling, pledged the notes as collateral security to another creditor, to whom they were assigned and delivered,

who took them before maturity, without notice of the rights of the bank: *Held*, that the latter creditor was a *bona fide* purchaser for value, and, as such, entitled to protection as against the bank.

14. Where the pledgee of notes secured by deed of trust delivers the same to the maker, who is also the payee and indorser, in trust, to sell the same for the benefit of the pledgee, and such maker and holder assigns the same, before maturity, to another creditor as collateral security for a *bona fide* debt, who takes without notice of the terms on which the pledgor parted with them, the latter creditor so receiving them will be protected as against the secret equities of the pledgee.

15. Error—*who may complain.* The party against whom a decree is rendered alone can be heard to complain that it is for too large a sum. Another party whose rights are not thereby injuriously affected can not assign for error that the decree is too large.

Appeal from the Appellate Court for the Second District;— heard in that court on appeal from the Circuit Court of Will county; the Hon. Dorrance Dibell, Judge, presiding.

This is a bill filed on July 2, 1886, in the Circuit Court of Will County by the appellee, Robert Pilcher, against Edward C. Hagar, trustee, Lorenz Reitz, Sheriff, Maria E. Dillman, Frederick H. Riebling and his wife, the First National Bank of Joliet, George W. Hyde, William Adam, and Joseph Whittier and George Whittier, composing firm of J. Whittier & Co., to foreclose two trust deeds, executed by said Riebling and wife to said Hagar, as trustee.; to determine the character of property therein described, and the rights and priorities of the several parties in the proceeds of the sale thereof, and the amount due each. The bill asks for the appointment of a receiver, for an injunction against said Bank and Reitz, the sheriff, restraining them from selling said property under execution levies, and for general relief. All the defendants answered the original bill, and replications were filed to the answers. The Bank and Whittier & Co. filed cross-bills, which were also answered, and replications were filed to such answers. Dillman, Pilcher, the Bank, and Whittier & Co. are creditors of Riebling, interested in the notes secured by

the trust deeds. Hyde and Adam are owners of portions of the property mortgaged, and lessors of Riebling, claiming rent due from him under their leases to him. The injunction was granted; Hagar was appointed receiver; decrees were entered; all the property was sold by the master and receiver. The questions arising upon the assignments of error relate to the distribution of the proceeds of sale among the creditors, as directed by the decrees and orders entered below. The Bank was the only creditor, who took an appeal to the Appellate Court from the decree of the Circuit Court. The Appellate Court affirmed the decree of the Circuit Court, except that it reduced the amount allowed to the appellee, Adam, for rent claimed by him. The present appeal from the Appellate Court is prosecuted by the Bank alone; and Adam assigns cross-errors as to the reduction made in the amount decreed to him.

Riebling and wife executed a trust deed, dated and recorded March 5, 1883, conveying lots 3, 4 and 5, block 36, and lots 1, 2 and 3, block 37, in North Joliet, with the buildings, machinery, fixtures and appurtenances belonging to the paper-mill situated thereon known as "The Des Plaines River Paper Mill," to Hagar, trustee, to secure 15 notes of same date made by Riebling, payable to the order of himself, each for $1000.00, all endorsed by him, and numbered respectively from 1 to 15. Riebling did not own said lots 2 and 3 in block 37, but held the same under a lease, dated August 1, 1881, executed to him (and one Kramer who assigned his interest therein to Riebling March 5, 1883) by said Hyde, by the terms of which Hyde leased to Riebling and Kramer "water and water power not to exceed in capacity 150 horse power," and also said lots 2 and 3 in block 37 from August 1, 1881, to June 17, 1896, at a rental of $1500.00 per annum payable semi-annually.

Of said 15 notes no. 1 was paid; nos. 2, 3, 4 and 5 were delivered by Riebling to Pilcher as collateral security for an indebtedness from the former to the latter of $3136.61 upon

three notes executed in 1882; no. 6 had been pledged by Riebling as collateral security for a debt of $500.00 to one Robisson, who sold his claim to Pilcher and, as part of the transaction, turned over said note no. 6 to Pilcher; no. 9 was sold by Riebling to said Dillman; the remaining 8 notes were delivered by Riebling to said Bank as collateral security for money loaned.

Riebling and wife executed another trust deed dâted August 19, 1884, and recorded August 20, 1884, conveying lots 3, 6 and 7 in block 57 in School section Addition to Joliet, "including the buildings, machinery, fixtures and appurtenances contained in, belonging to and comprising the paper mill thereon situate known as The Joliet Paper Mill," to said Hagar, as trustee, to secure six notes of same date made by Riebling, payable to the order of himself and by him endorsed, each for $1000.00. All the notes secured by this trust deed were delivered to said Bank as collateral security for the payment of the indebtedness, which then existed or might thereafter exist, from Riebling to the Bank.

In the second trust deed of August 19, 1884, Riebling covenants that he will "pay all taxes, assessments and other liens on said property or any part thereof;" that he will keep the "Paper Mill, machinery, fixtures and tools therein on said real estate, together with the other buildings and improvements thereon in good condition and repair;" that he will keep the mill, machinery and other buildings and improvements "situate or to be located or erected on said real estate" insured, and in the policies will make the loss payable to said trustee for the benefit of the holders of said notes; that "he is well seized of a leasehold interest in the said   *   *   *   real estate;" that he is the "owner, possessor and occupant" of the paper mill and the appurtenances and fixtures belonging thereto; that "he has good right and lawful authority to grant, bargain and sell his interest of leasehold in said real estate   *   *   * and to grant, bargain and sell said paper mill, its fixtures,

machinery and appurtenances;   \*  \*  \*   and that the same are free and clear of liens and incumbrances whatsoever."

The leasehold interest of Riebling was acquired under two leases executed to him by the said Adam. The first lease, dated July 9, 1877, and recorded October 10, 1878, executed by Adam to Riebling (and C. A. Young who transferred his interest to Riebling in 1878) demises to the lessees said lot 3 in block 57 except the north 6 feet and the east 75 feet, and lots 6 and 7 in said block except the east 75 feet thereof, to hold from July 9, 1877, to July 9, 1897; Adam therein agrees to furnish a certain amount of water from two water-wheels next west of the east wall of a flume or race there constructed and running through said lots, putting the walls, bulk-head race or flume and water wheels in good condition; the lessees agree to pay as rent $800.00 per annum quarterly beginning on January 1 of each year; if lessees need more water power, it is to be granted at a certain rate; the lease may be renewed for a term not exceeding 20 years upon due notice, etc.; if the water is drawn off while the lessees are using it, "no rent shall be collected for such time the water is drawn off exceeding two days;" the lease provides that "the taxes on the above leased property shall be paid by their respective owners, that is, the taxes on the real estate at its valuation before the buildings and improvements were put on shall be paid by the party of the first part; the taxes on the buildings, machinery and other improvements shall be paid by the parties of the second part;" the lease also provides as follows: "It is expressly understood and agreed by and between the parties aforesaid, that if the rent above reserved, or any part thereof, shall be behind or unpaid on the day and at the place of payment whereon the same ought to be paid as aforesaid, or if default shall be made in any of the covenants herein contained to be kept by the said party of the second part (lessees), their executors, administrators and assigns, it shall and may be lawful for the said party of the first part (lessor), his heirs, executors, adminis-

trators, agent, attorney or assigns, at his election, to declare said term ended, and the said demised premises, or any part thereof, either with or without process of law, to re-enter, and the said party of the second part, or any other person or persons occupying, in or upon the same, to expel, remove and put out, using such force as may be necessary in so doing, and the said premises again to repossess and enjoy as in his first and former estate."

Said lease also provides that for any rent due and unpaid the lessor may distrain "upon any property belonging to the said party of the second part, whether the same be exempt from execution or distress by law or not, and the said party of the second part in that case hereby waives all legal right which he now has or may have to hold or retain any such property under any exemption laws now in force in this State, or in any other way, meaning and intending hereby to give the said party of the first part, his heirs, executors, administrators and assigns, a valid and first lien upon any and all goods, chattels or other property belonging to the said party of the second part, as security for the payment of said rent in manner aforesaid." And it provides that if lessees remain in possession thirty days after termination of the lease or after default, they shall be deemed guilty of forcible detainer under the statute.

The second lease, dated July 1, 1879, and not recorded, demises additional water power from January 1, 1880, to July 9, 1897, at $300.00 per year payable quarterly beginning on January 1 of each year; it contains substantially the same provisions as the above lease; it provides that it "shall be and is hereby attached to" said former lease of July 9, 1877, and shall be subject to the conditions of said former lease; it demises the power derived from water-wheel number 2 situate about 20 feet north of the south line of lot 2 in said block 57, etc., to be conveyed to the mill by a shaft.

On March 5, 1886, Adam caused a distress warrant to be issued to a constable, reciting that $1908.67 were due to him from Riebling for rent up to January 1, 1886, for the premises described in the lease of 1877 and for the water power described in the leases of 1877 and 1879, and requesting said constable to make distress for said rent of the goods and chattels of said Riebling, etc.    The following is the inventory of the property distrained under said warrant on March 5, 1886, towit:   "One paper-mill building and sheds attached; one storehouse building; 350 bundles of paper; two office desks; two chairs; one stove; two oil tanks, four iron pulleys; two barrels of resin; one barrel paper stock; $\frac{1}{4}$ M. shingles; one paper-machine and attachments; two paper-engines and attachments; one boiler, pump and attachments; all belting, gearing, shafting and pulleys in said building; six bleach tubs; one pair portable scales."

In the distress warrant proceeding verdict for Adam for $1908.67 was rendered on February 1, 1887, and judgment in his favor for that amount on February 12, 1887.

The indebtedness of Riebling to the Bank, for which the 8 notes secured by the first trust deed of 1883 were held as collateral security, was in the form of judgment notes, and judgments by confession were entered thereon in favor of the Bank against Riebling on March 15, 1886, for $14,086.97, upon which executions were issued on the same day and levied on March 15 and June 11, 1886, upon the property described in the two trust deeds.    The indebtedness for which Pilcher held said notes 2, 3, 4 and 5 as collateral security, was also reduced to judgment for $3281.89 on May 15, 1886, and execution issued on that day and levied on August 12, 1886, upon said property.    No sales were made under said executions, as they were enjoined.

On February 7, 1887, Hagar was appointed receiver of all the property embraced in both trust deeds by consent of all the

parties. On February 8, 1887, an order was entered authorizing the receiver to rent the Des Plaines River Paper Mill with its machinery, etc., to Pilcher by the month at $150.00 per month. March 8, 1887, it was stipulated that the receiver should take possession of the property seized by Adam under his distress warrant and that his rights should be heard in this suit, and an order was entered for the receiver to solicit bids for the purchase of the property embraced in the trust deeds, all parties to have the same rights in the proceeds of the sale as in the property. On June 25, 1887, Adam made an offer to purchase of the receiver all the property covered by the second trust deed and situated on the property leased by him to Riebling, including the machinery, buildings, tools, fixtures, boiler, engines, etc., and all the property seized under the distress warrant, except the 350 bundles of paper, for $3500.00, the offer to include a surrender and cancellation of Adam's leases to Riebling. An order was entered on June 25, 1887, accepting this offer by consent of all the parties and canceling the leases, and directing that the money be treated as the property would have been had there been no sale, and that the priorities of the parties be determined in the funds the same, as though the property had remained unsold.

On June 28, 1888, the Court rendered a decree of foreclosure of the first trust deed of 1883 and directing a sale of the lots and leasehold interest therein described, reserving the matters involved in the second trust deed. The property named in the first trust deed was sold by the Master for $10,500.00. On October 2, 1888, an order of distribution of the proceeds of sale was entered, which so far as is necessary, is noticed in the opinion. On December 17, 1888, a further decree was entered disposing of the $3500.00 paid by Adam to the receiver. So much of this order as it is necessary to consider is noticed in the opinion.

Mr. Benjamin Olin, and Mr. A. O. Marshall, for the appellant:

The court erred in allowing Adam $1255 for rent accruing after eviction of the tenant. Taylor on Landlord and Tenant, (5th ed.) secs. 378, 380, 386, 387; *Wade* v. *Halligan*, 16 Ill. 512; *Halligan* v. *Wade*, 21 id. 470; *Smith* v. *Wise*, 58 id. 141; *Lynch* v. *Baldwin*, 69 id. 210.

There was no landlord's lien. *Herron* v. *Gill*, 112 Ill. 247; *Morgan* v. *Campbell*, 22 Wall. 381.

The levy of the distress warrant was illegally attempted to be made on real estate. What is a fixture? Taylor on Landlord and Tenant, secs. 544, 545; Wood on Landlord and Tenant, secs. 527, 529; *Griffin* v. *Marine Co.* 52 Ill. 130; *Dobschuetz* v. *Holliday*, 82 id. 371; *Conklin* v. *Foster*, 57 id. 105.

The property, being a fixture, was not liable to distress. Rev. Stat. chap. 80, secs. 16, 18, 30; Taylor on Landlord and Tenant, sec. 592; Wood on Landlord and Tenant, p. 935, sec. 543.

Adam had no priority or prior lien to the mill property under or by virtue of the clause in the lease. This clause refers to chattels personal.

Where property not in existence is mortgaged, a valid or lawful seizure after it comes into existence must be made before liens or rights of third persons attach. Such seizure was not made by Adam. Subsequently acquired property, not held by mortgage, etc. *Hunt* v. *Bullock*, 23 Ill. 320; *Gittings* v. *Nelson*, 86 id. 593.

The property must be in existence when mortgaged, to affect third persons. 2 Hilliard on Mortgages, (4th ed.) p. 410, sec. 7; *Winslow* v. *Merchants, etc.*, 4 Metc. 306; *Moody* v. *Wright*, 13 id. 17.

The property must be so described in and by the terms of the instrument or mortgage as to be identified. In Adam's lease the description is: "Any and all goods, chattels or

other property belonging to said party of the second part." This identifies nothing. Such a description of either real or personal property, certainly, is not good as against third persons holding under an instrument specifically describing certain property. Also, it would embarrass trade, lead to all sorts of fraud, and, as a blanket mortgage, would be void, as against public policy. See cases last above cited; Rev. Stat. chap. 95, sec. 3, and chap. 30, sec. 1.

The case of *Eames* v. *Mayo*, 6 Bradw. 334, turned upon another question, and as to that other question is not authority, as shown in *Herron* v. *Gill*, 112 Ill. 247, *Rowland* v. *Hewitt*, 19 Bradw. 450, and *Ketchum* v. *St. Louis*, 11 Otto, 306.

The court erred in refusing to allow appellant the benefit of the six collateral notes under the first trust deed of March 5, 1883, taken away by Reibling, and in distributing the proceeds in favor of Pilcher.

Messrs. Garnsey & Knox, for the appellee Adam:

There was no eviction of Reibling by the levy of the distress warrant.

The following cases decide that an execution may be levied on buildings, etc., without a severance: A house: *Foster* v. *Mabe*, 27 Am. Dec. 749. Carding machines attached to the building: *Gale* v. *Ward*, 14 Mass. 355. Carding and spinning machines: *Cresson* v. *Stout*, 17 Johns. 118. A saw mill: *Russell* v. *Richards*, 25 Am. Dec. 256. Com. elevator: *Walton* v. *Wray*, 54 Iowa, 531. Ice house: *Ham* v. *Kendall*, 111 Mass. 297.

Replevin or trover will lie for such buildings. *Ballou* v. *Jones*, 37 Ill. 95; *Davis* v. *Taylor*, 41 id. 407.

The rule seems to be that things which, though affixed to the freehold, are yet, by reason of their situation or the agreement of the parties, personalty, will bear the character of personalty in every case. (*Fortman* v. *Guepper*, 14 Ohio St. 567; *Elwes* v. *Maw*, 3 East, 38; 2 Smith's Lead. Cas.; *Sword* v.

*Low,* 122 Ill. 487.) And that a severance from the realty is not required to subject them to execution as personalty, is explicitly decided in *Russell* v. *Richards,* 25 Am. Dec. 256, and *Foster* v. *Mabe,* 37 id. 256.

Between the parties and third persons having notice, the lease, in effect, is a lien security for the rent. It was an equitable mortgage. 1 Jones on Mortgages, secs. 162, 168; Story's Eq. Jur. sec. 1231; *Chadwick* v. *Clapp,* 69 Ill. 121; *Peckham* v. *Haddock,* 36 id. 45.

Had this been a mortgage in form, given by Reibling to Adam, acknowledged and recorded, there would be no earthly question about it. At most, for the other side, it may be claimed that it is an imperfect security. But if such, and the bank had notice, still it will accomplish its object as fully as if it were perfect in all its parts. It is the professed object of a court of equity to protect and enforce equitable securities, and to give effect to such by way of mortgage. *McCaffrey* v. *Woodin,* 65 N. Y. 645; 22 Am. Rep. 644; *Delair* v. *Keenan,* Am. Dec. 604; *Bank* v. *Carpenter,* 4 id. 623; *Whiting* v. *Eichelberger,* 16 Iowa, 423; *Everman* v. *Robb,* 24 Am. Rep. 683; *Fejavery* v. *Broesh,* 52 Iowa, 88; *Railroad Co.* v. *Talman,* 15 Ala. 472.

Messrs. Higgins & Akin, for the appellee George W. Hyde.

Mr. George S. House, for the appellee Pilcher.

Mr. Chief Justice Magruder delivered the opinion of the Court:

The appellant claims, that the decree was erroneous in allowing such portions of the proceeds of the sale under the first trust deed, as belonged to notes numbered 2, 3, 4, 5 and 6, to be applied upon Riebling's indebtedness to Pilcher, rather than upon Riebling's indebtedness to the Bank. It is contended by appellant, that the 15 notes of $1000.00 each, secured by the trust deed of March 5, 1883, were originally delivered

to the Bank to secure its indebtedness then existing, or thereafter to exist, against Riebling; that the Bank permitted Riebling to take six of these notes numbered from 1 to 6 inclusive in order that he might sell them, if he could, and apply the proceeds of the sale on his indebtedness to the Bank, the notes to be returned to the Bank in case there was no sale; that Riebling thus obtained the six notes burdened with a trust in favor of the Bank, and had no right to pledge them as collateral security to another creditor. It is conclusively shown that note no. 1 was paid and cancelled, and we see no reason why appellee, Pilcher, was not entitled to hold the other notes as collateral security for the payment of Riebling's indebtedness to him.

The Bank permitted Riebling to take the notes in question from its possession. Pilcher had no notice that Riebling held the notes in trust to make sale of them for the Bank. He held judgment notes for nearly $3000.00 against Riebling, and threatened to enter up judgments upon them, unless additional security was furnished. Thereupon Riebling delivered to him notes numbered 2, 3, 4 and 5, secured by said trust deed, as such additional security. The same state of facts exists in regard to the delivery of note no. 6 to Robisson to secure the claim which he afterwards assigned to Pilcher. The 15 notes were payable at different times, three of them running as long as five years. The trust deed provided that they were to stand equally secured, no one to have priority over the others in the application of the security.

Riebling denies the statement of the president of the Bank that he agreed to return the notes in the event of a failure to sell them, or that the proceeds of their sale were to be applied upon his indebtedness to the Bank; he claims that the notes belonged to him, and that he had a right to dispose of them as he did. After note no. 9 was sold to Maria E. Dillman, the proceeds were placed to Riebling's credit in the Bank, and by him checked out in due course of business. When he took

the notes in question, it would appear that the eight notes left with the Bank were regarded as sufficient security for the indebtedness then existing, the makers of the paper endorsed by Riebling not having failed at that time to pay. But we do not deem it necessary to determine whether Riebling did or did not obtain the notes in the manner stated by the officers of the Bank. Even if they *were* so obtained, Pilcher received them from Riebling in good faith before their maturity as collateral security for a *bona fide* indebtedness, without notice of the terms on which the Bank parted with them ; and, as the holder of them, he is entitled to share in the proceeds of the sale. The correctness of this conclusion is further sustained by the admission of the Bank, that the six notes, executed afterwards on August 19, 1884, and secured by the trust deed of that date, were received from Riebling by the Bank, as security for its indebtedness, *in the place and stead* of the six notes, secured by the trust deed of March, 1883, which the Bank had permitted Riebling to take from its possession. We also think that the amount which was decreed to be paid to the appellee, Pilcher, was correct as between him and the Bank.

The appellant further objects to the decree below upon the alleged ground, that it allows the appellee, Hyde, too much rent for the water-power used by the Des Plaines River Paper Mill, situated on lots 2 and 3 in block 37, as described in the trust deed of March, 1883. Under the lease from Hyde to Riebling of August 1, 1881, all the rent was paid up to February 1, 1887. The court decreed that the receiver should pay Hyde, out of the rents received from the receiver's lessee, the sum of $10.00 per horse power for 132 horse power from February 1, 1887, that is, at the rate of $1320.00 per year. The original lease from Hyde to Riebling provides for the payment of $1500.00 per year, but counsel for both sides seem to concede that the amount to be paid should be at the rate of $10.00 per horse power. The question then is, how much power was furnished ? The water and water power were not,

to exceed 150 horse power. It seems that before August 1, 1886, a dispute arose between Hyde and Riebling as to the amount of power furnished, and they agreed upon 100 horse power, or $1000.00 per year. By the latter date, however, improvements and changes were made by which a greater quantity was furnished, and Hyde claimed the full rental of $1500.00 per year, and only received less under protest. Riebling admits that after August 1, 1886, more than 100 horse power was furnished, and Hyde swears that 132 horse power was furnished after February 1, 1887. The Court acted upon this proof in making the allowance to Hyde, and we see no reason for disturbing the decree in this regard.

But the questions of most difficulty in the case arise under the second trust deed of August 19, 1884, and the leases of 1877 and 1879 from Adam to Riebling. These questions relate to the conflicting claims of the appellant as mortgagee, and of Adam as lessor, to the property described in the second trust deed. It is contended on the part of the appellee, Adam, that he had an equitable mortgage or lien by virtue of the lease of July 9, 1877, upon the buildings, machinery and attachments comprising The Joliet Paper Mill; that appellant was affected with notice of such lien because the lease was recorded as early as October 10, 1878, and because appellant's trust deed put it upon inquiry by describing Riebling's interest as a leasehold interest; and, furthermore, that the appellee, Adam, was entitled to hold the property levied on under his distress warrant, because he thereby reduced the same to possession before appellant took any action under his trust deed, or his judgments.

On the other hand, it is contended on behalf of the appellant, that it obtained a first lien upon the leasehold interest of Riebling and upon the mill and buildings and machinery comprising the Joliet Paper Mill, by virtue of its trust deed dated August 19, 1884, and recorded the next day.

32—138 ILL.

Leaving out of view for the present the portable or movable personalty in the mill and its buildings, or upon the demised premises, which was taken under the distress warrant, the question arises, what was the character of the property mortgaged by the trust deed as to its being realty or personalty?

When Adam's lease to Riebling was made on July 9, 1877, no paper mill or buildings had yet been constructed, but the stone foundations of an old mill were on the property with the race-way, flumes, gates and appurtenances for water power ready to be attached. The upper part of the mill was built upon these stone foundations, and the lower part rested partly upon stone foundations built upon the ground, and partly on posts planted in the bed of the river; the upper part was 30 by 40 feet and had two stories; the lower part was 24 by 90 feet and had one story; connected with or joined to the latter, and resting upon the ground, was a building used as a bleach-room; there was also a store house built upon posts standing in the ground. The paper machines, boilers, etc., were all attached to the structure. The mill, with its buildings and machinery, was erected and in operation on August 19, 1884, when the trust deed was executed. Such buildings and machinery cannot be regarded otherwise than as fixtures. The structures were affixed to the land in such manner as to be a part of the realty, and, although it may have been possible for the tenant to remove them, they constituted a part of the freehold until severed therefrom. (Wood's Landlord and Tenant, sec. 527.) The mill and buildings and the machinery all formed a part of the leasehold estate; with the lease, they were chattels real. (*Griffin* v. *Marine Co. of Chicago,* 52 Ill. 130; *Conklin* v. *Foster,* 57 id. 104; *Dobschuetz* v. *Holliday,* 82 id. 371.) Therefore, they were the proper subject matter of a real estate mortgage; and the trust deed created a valid mortgage lien upon them in favor of appellant as the holder of the notes secured thereby.

Was the lien thus created by trust deed subject to any prior lien thereon under the lease of 1877? The record of that lease, although it was not acknowledged, undoubtedly operated as notice to subsequent purchasers and incumbrancers of the existence of the lease, and of the rights of the lessor thereby conferred. (*Willoughby* v. *Lawrence*, 116 Ill. 11.) But did the lease itself by its terms give the lessor, Adam, a lien upon the buildings, machinery and fixtures, comprising the paper-mill, which were thereafter erected upon the premises by Riebling?

Independently of the provisions of the lease, a landlord in this State has no common law lien upon the property of his tenant for rent; and he has no statutory lien except as to growing crops. (*Herron* v. *Gill*, 112 Ill. 247; *Morgan* v. *Campbell*, 22 Wallace, 381.) The clause in the lease in this case, which is said to give the lessor a lien, is the following: "Meaning and intending hereby to give the said party of the first part, his heirs, executors, etc.,   *   *   *   a valid and first lien upon any and all goods, chattels or other property belonging to the said party of the second part, as security for the payment of said rent," etc. There is no statement in express terms, that the buildings to be erected are to be subject to a lien for the rent. The solution of the question, whether or not the lease gave a lien upon the mill property already described, depends upon the construction to be given to the words: "all goods, chattels *or other property.*" Does the expression, "or other property," cover and include the mill buildings, machinery and fixtures? The clause, in which this expression occurs, follows immediately the clause, which authorizes the landlord to distrain for his rent upon any property belonging to the tenant, whether exempt by law from execution or distress, or not. In this State, only personal property can be distrained for rent. (Rev. Stat. chap. 80, sec. 16; Taylor's Landlord and Tenant, sec. 592; *Kussing* v. *Keohane*, 4 Brad., 461; *Morgan* v. *Campbell, supra.*) The most natural applica-

tion of the word, "other," as here used, is to refer it back to
the words, "goods, chattels," which immediately precede it.
The expression, "or other property," would seem to have been
intended to designate such other personal property as might
be the subject matter of a distress for rent.   Under the rule
of construction, that "general and specific words, which are
capable of an analogous meaning, being associated together,
take color from each other, so that the general words are re-
stricted to a sense analogous to the less general," (*Misch* v.
*Russell*, 136 Ill. 22,) the general words, "or other property,"
would be restricted to a meaning analogous to the meaning of
the words, "goods" and "chattels," and, consequently, would
not embrace such property as fixtures or chattels real, par-
taking more of the nature of realty than personalty.

But if this construction is not correct, the words, "or other
property," are too indefinite, as a description of after acquired
property, to charge third persons with notice of an equitable
mortgage thereon.   (*Winslow* v. *Merchants' Ins. Co.* 4 Metc.
306 ; *Moody* v. *Wright*, 13 id. 17 ; 1 Jones on Mtges. sec. 528 ;
*Wait* v. *Smith*, 92 Ill. 385.)   The rule that the description
must be sufficiently specific to afford third persons the means
of identifying the property refers to chattel mortgages, as well
as to mortgages of land.   (Jones on Chattel Mtges. secs. 54
and 55 ; *Rhutasel* v. *Stephens*, 68 Iowa, 627 ; *Hutton* v. *Arnett*,
51 Ill. 198.)

In *Webster* v. *Nichols*, 104 Ill. 160, which was a controversy
between the lessor on the one side and the tenant and an as-
signee of the tenant on the other side, and not a controversy,
as is this one, between the lessor and a mortgagee of the tenant,
the lessor was permitted to enforce in equity a lien reserved
by the lease upon the buildings erected by the tenant after the
execution of the lease ; but, there, the lease provided in express
terms, that the rent should be "a valid and first lien upon any
and all buildings and improvements on said premises, or that
may at any time be erected, placed or put" thereon by the

tenant. But, in the case at bar, the language reserving the lien can only be made to apply to buidings to be erected in the future by a forced or strained construction. The words, "belonging to the said party of the second part," do not necessarily refer to future ownership, but to that existing at the date of the lease. It is not clear, that the lease reserves a lien upon after acquired property. The only clause in the lease, which could be construed as pointing to the future erection of such buildings, is that which provides for the payment of the taxes on the land by the lessor, and on the buildings by the lessees. But the indefiniteness of the description contained in the words, "or other property," is not cured by carrying those words back and connecting them with the provision in regard to the taxes.

In *Borden* v. *Croak,* 131 Ill. 68, we have recently held that, where the terms of a lease provided for "a valid and first lien for said rent accruing and to accrue upon the property of the person or persons liable therefor," there was no reference thereby to after acquired property, but that, if such language could be held to include subsequently acquired property, it was not sufficiently definite and certain to create a lien thereon.

It is urged, however, on the part of the appellees, that the lease itself treats the lessor as the owner of the real estate and the lessees as the owners of the mill, and, by providing for the payment of the taxes on the mill by the tenants, characterizes it as personal property. If it were true, that the provision in the lease in regard to the taxes indicated an intention, or agreement between the lessor and lessees, to regard the improvements as personalty, such intention or agreement could have no effect upon the rights of third persons; it could not, as to them, convert what the law regards as a part of the realty into personal property. In *Dobschuetz* v. *Holliday, supra,* we said: "Whatever may have been the private agreement of the parties, it is very clear the engine when set up and attached to the realty, as it was, became a part of the estate

the lessee had in the premises. No doubt the parties could agree among themselves they would treat the engine and other fixtures as personalty, but their private agreement could not change the character of the property so far as third parties were concerned."

We do not understand that the doctrine of the Holliday case is opposed to the views expressed in *Sword* v. *Low,* 122 Ill. 487. In the latter case an engine and boiler, attached to the realty so as to be capable of removal without injury to either, was held to have retained its character as personalty by reason of the agreement of the parties to that effect, even as against subsequent purchasers or incumbrancers. But, there, the agreement of the parties was made manifest by a chattel mortgage upon the boiler and engine, which was executed, acknowledged and recorded as required by the statute, and thereby notice of the personal character of the articles attached was given to third persons. Here, however, the lease was not acknowledged and recorded in accordance with the chattel mortgage Act, and hence the appellant, as holder of the trust deed, was not bound to take notice of any intention manifested by the terms of the lease to treat the fixtures as personalty. Even a chattel mortgage does not create a lien on personal property brought into existence after its execution, as against creditors or purchasers. (*Webster* v. *Nichols, supra.*)

For the reasons thus stated, we are of the opinion that the appellee, Adam, acquired no lien upon the mill, buildings, machinery and fixtures, which was superior to the lien of appellant's trust deed. All the fixtures and articles taken under the distress warrant and turned over to the receiver, were sold by the latter for $3500.00, and, by agreement of the parties, their rights in this money were to be determined the same as though the property had remained in its original condition. So much of the money as represents the proceeds of the sale of the buildings, shed, storehouse, machines and engines and their attachments, oil-tanks, iron pulleys, boiler pump and

attachments, and all belting, gearing, shafting and pulleys should be applied to the payment of the indebtedness secured by the trust deed. But the appellee, Adam, was entitled to hold all the other articles, such as the desks, chairs, stove, barrels of resin, etc., belonging to Riebling, which he seized and reduced to possession under his distress warrant; and so much of the fund, as represents the proceeds of the sale of these articles, should be applied to the payment of Riebling's indebtedness to Adam for rent.

It is further claimed by the appellant, that the decree of the Circuit Court in favor of the appellee, Adam, was for too large an amount. The amount due Adam upon both leases of 1877 and 1879 was $1908.67 for rent accrued up to January 1, 1886. For this amount the distress warrant was levied, and for this amount judgment was rendered in the distress proceeding. The trial court not only rendered a decree for $1908.67, but also for $1255.00 being the accrued rent upon both leases from January 1, 1886, to June 25, 1887, the latter being the date of the sale to Adam for $3500.00.

The contention of the appellant is, that Adam levied his warrant not only on the detached personalty, but also on the buildings, machinery and fixtures; that the levy upon the latter was improper, as they were a part of the realty; that, in making the levy, Adam took possession of the buildings and machinery, and locked the doors, and prevented the operation of the mill by Riebling; that this conduct amounted to an eviction of Riebling; that the latter was thereby deprived of the use of the demised premises, and, therefore, not liable for rent after March 5, 1886, the date of the seizure under the distress warrant; hence, that the decree was erroneous as to the $1255.00. The rent from January 1, 1886, to March 5, 1886, was properly allowable, as accruing before the levy, under appellant's own theory. Appellee, Adam, contends on the other hand, that there was no eviction; that the lease was

in force; and that the tenant was liable for all the rent until the lease was cancelled by the sale.

Counsel on both sides have submitted learned and able arguments upon this branch of the case as to what constitutes eviction, and as to the right to levy a distress warrant upon fixtures treated as personalty by the parties to the lease. We do not deem it our duty to pass upon any of these questions, as it is unnecessary to do so in order to decide this case. The decree for rent was in favor of Adam and against Riebling. The latter is the only party entitled to complain, and he is not here assigning errors. It is true, that the Circuit Court held the buildings, machinery and fixtures to be subject to a lien under the leases, and, so, decreed the whole amount found to be due to Adam to be paid out of the $3500.00. If the decree in this regard were to stand, then appellant might be interested in having the amount of Adam's decree reduced, in order that the Bank might receive a larger proportion of the $3500.00. But in view of the conclusions which we have announced upon this branch of the case, it is a matter of no concern to the appellant, whether the amount decreed to be due from Riebling to Adam is great or small. The lessor, Adam, had no lien upon the detached personalty under his lease, which was not acknowledged and recorded as required by the Act in regard to chattel mortgages, but his right to the proceeds of the sale of such personalty was due to the fact, that he took it under his distress warrant. The amount, for which the distress warrant was levied, and for which judgment was rendered in that proceeding, towit: $1908.67, was the only amount, due to Adam, to the payment of which the detached personalty levied upon could be applied. It was only the rent accrued up to January 1, 1886, and not the rent accruing after that time, that was to be made by the levy of the distress warrant. No part of the rent represented by the sum of $1255.00 was embraced in the judgment in the proceeding by distress warrant. Under the statute, where the tenant

abandons the demised premises, growing crops may be seized whether the rent is due or not. (Rev. Stat. chap. 80, sec. 33.) But otherwise, property cannot be taken under a distress warrant, except for rent due. (*Asay* v. *Sparr*, 26 Ill. 115; *Hare* v. *Stegall*, 60 id. 380; *Harms* v. *Solem*, 79 id. 460; *Johnson* v. *Prussing*, 4 Bradw. 575).

In the case at bar, the record shows, that the detached personalty was levied upon on March 15, 1886, under the executions issued upon appellant's judgments, and on August 12, 1886, under the executions issued upon Pilcher's judgment, both of these levies being subject to the levy under the distress warrant made on March 5, 1886. Therefore, if the portion of the $3500.00, which represents the personal property, not attached to the realty and levied upon by Adam, is more than sufficient to pay the $1908.67, the surplus is to be applied first to the payment of appellant's judgments, and next to the payment of the judgment of the appellee, Pilcher. Such surplus cannot be applied to the payment of the $1255.00 in preference to the executions which were subject only to Adam's distress warrant for $1908.67. It follows, that it is unnecessary to disturb the decree below in so far as it found Riebling to be indebted upon the lease to Adam for $1255.00, because the Bank, the only appellant here, has no right to complain of the decree in this respect. Hence, the judgment of the Appellate Court was erroneous in reversing the decree below as to said sum of $1255.00. The judgment of the Circuit Court was also erroneous in awarding the appellee, Adam, a lien upon the mill buildings, machinery and fixtures under his leases.

The costs of this Court will be divided between appellant and the appellee, Adam.

The decree of the Circuit Court and the judgment of the Appellate Court are reversed, and the cause is remanded to the Circuit Court for further proceedings in accordance with the views herein expressed.

*Judgment reversed.*