Anthony P. GRECO and Buffet Internati-
onale, Inc., an Illinois corporation,
d/b/a Greco's Restaurant, Plaintiffs-
Appellants,

v.

Robert GUSS, individually and as Presi-
dent of the Village of Palatine, et
al., Defendants-Appellees.

No. 84–2811.

United States Court of Appeals,
Seventh Circuit.

Argued April 25, 1985.
Decided Oct. 1, 1985.

Katrina Weing, Chicago, Ill., for plaintiffs-appellants.

John B. Murphy, Ancel, Glink, Diamond, Murphy & Cope, P.C., Chicago, Ill., George E. Downs, Palatine, Ill., Fred Weiszmann, Northbrook, Ill., William Frazier, Lord, Bissell & Brook, Chicago, Ill., for defendants-appellees.

Before BAUER and WOOD, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

Plaintiffs Anthony Greco and Buffet Internationale brought this action under 42 U.S.C. § 1983 (1982) alleging two unconstitutional takings. Their second amended complaint contained six counts. Count I alleged that the Village of Palatine and the Village Trustees transferred or revoked Buffet's liquor license without due process of law, in violation of 42 U.S.C. § 1983 and the fourteenth amendment of the United States Constitution. Count II alleged that Robert Galloy conspired with the Village Trustees to deprive Buffet of its liquor license and to obtain Buffet's license for Galloy's use in his own restaurant. Count III alleged that Galloy, Fred Weiszmann, Cambridge Court Ventures, and a Cook County deputy sheriff acted jointly under color of and pursuant to the Illinois Distress for Rent Act, Ill.Rev.Stat. ch. 110, § 9–301 *et seq.*, to serve a distress warrant on Buffet, and to seize and hold for sale assets and property of Buffet and Greco. Plaintiffs alleged that this seizure deprived Buffet and Greco of their property without due process of law, in violation of 42 U.S.C. § 1983 and the fourteenth amendment of the United States Constitution. Count III further alleged that the Distress for Rent Act violated the fourteenth amendment of the United States Constitution. Finally, Count III alleged that Galloy, Weiszmann and Cambridge deprived Buffet and Greco of their property without due process of law by entering an unauthorized appearance on Buffet's behalf in the state court distress for rent action. Count IV alleged the same facts as Count III but also alleged that the deprivation resulted from a conspiracy between Galloy, Weiszmann, Cambridge, and the deputy sheriff. Counts V and VI, pendent state tort claims, alleged that Galloy, Weiszmann and Cambridge, by the seizure and sale of Buffet and Greco's property, converted the plaintiffs' personal and corporate property and assets. The district court dismissed the claims against the Village Trustees, granted summary judgment on the other section 1983 claims, and dismissed without prejudice the pendent state law claims. We affirm.[1]

## I.

Plaintiff Anthony Greco and defendant Robert Galloy each own fifty percent of Buffet Internationale, Inc., an Illinois corporation that did business as Greco's Restaurant. From December 1, 1975 to June 13, 1980 Buffet operated the restaurant and lounge on premises leased from defendant Cambridge Court Ventures. Buffet served liquor at that location under a license from the Village of Palatine. In June, 1980, Buffet owed the Bank & Trust Company of Arlington Heights more than $100,000, a debt which was secured by a lien on the restaurant's equipment and fix-

---

**1.** After oral argument, the Village defendants moved to "clarify the record on appeal," and appended portions of two depositions. Since the depositions themselves were already in the record, the motion is in effect a rebuttal of a statement made by plaintiff's counsel at oral argument. The motion is denied.

tures and a deed of trust on Galloy's home. None of Greco's personal assets secured Buffet's indebtedness. Viewed in the light most favorable to the plaintiffs, the rest of the facts are as follows.

Buffet fell in arrears in its rent payments to Cambridge in early 1980 and defendant Weiszmann, a partner and attorney for Cambridge, contacted Greco several times about the overdue rent. On June 13, 1980, Weiszmann entered the lounge with a Cook County deputy sheriff and a Palatine police officer. The deputy sheriff approached Greco, identified himself, and served a distress warrant on Greco. The deputy sheriff also asked Greco for the keys and told Greco to get his personal belongings and leave. That evening Galloy and his wife helped Weiszmann inventory all personal property on the premises.

Weiszmann subsequently filed a copy of the distress warrant and the inventory with the Clerk of the Circuit Court of Cook County, who then issued a summons for Buffet and set a hearing for June 30, 1980. Greco was never served with the summons.

Between June 13 and June 23, Galloy took steps to salvage his investment in Buffet. By June 20, Galloy had arranged loans totalling $16,000. He also agreed with Weiszmann to assume Buffet's lease, with Weiszmann agreeing to loan Galloy $6,000 of the proceeds of the sheriff's sale in the distress for rent action. On June 23, 1980, Galloy filed a liquor license application with the Village of Palatine. That evening George Downs, an attorney representing Galloy, told the Village Trustees that Buffet was in fact bankrupt and that Greco was filing for personal bankruptcy. The Village Attorney then stated that Buffet had not filed an application to renew its liquor license, which expired June 30. Both of these statements were false, but, based on this information, the Village Trustees approved Galloy's liquor license request subject to Galloy obtaining a sales tax number and a license for food service. Greco learned of this action by June 27, 1980.

Galloy, his attorney, Weiszmann, and an officer of the bank appeared at the June 30th hearing on the distress for rent action. Neither Greco nor his attorney was present. The state court, finding that the appearance by Galloy, the vice-president of Buffet, gave the court jurisdiction over Buffet, ordered the distrained property sold subject to the lien of the bank. On July 27, 1980, the sheriff's sale was held, with Greco and his attorney, Galloy and his attorney, Weiszmann, and a bank representative in attendance. Galloy bid successfully on the property.

## II.

Section 1983 provides as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983 (1982). To prevail on a section 1983 claim, a plaintiff must show (1) that the conduct complained of was committed by a person acting under color of state law, and (2) that this conduct deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States. *See Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912–13, 68 L.Ed.2d 420 (1981). Here the plaintiffs claim that the seizure of their property without prior notice and a hearing violated due process. The defendants assert that service of the distress warrant did not constitute action under color of state law and that the distress for rent statute is constitutional.

The Illinois Distress for Rent Act ("the Act") requires no state involvement prior to distraining the property. The Act permits a landlord, his agent, or his attorney to seize for rent any of the tenant's personal property found in the county where the

tenant resides. Ill.Rev.Stat. ch. 110, § 9–301 (1983). The landlord files nothing in court prior to distraining the property; he simply fills out a distress warrant stating that rent is overdue, serves the warrant on the tenant, and seizes the tenant's property. "Immediately" after the seizure, the landlord must file a copy of the distress warrant and an inventory of property seized with the court clerk. Ill.Rev.Stat. ch. 110, § 9–302 (1983); *see also Schoenfeld v. Kulwinsky*, 197 Ill.App. 472, 474 (1916) ("immediately" means promptly). The court clerk then issues a summons against the tenant and the action proceeds like an action for attachment. *See* Ill.Rev.Stat. ch. 110, §§ 9–303, 9–305 (1983).

■ *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) provides the framework for analyzing plaintiffs' claims. In *Lugar*, the defendant had attached property of the plaintiff under Virginia's prejudgment attachment statute. That statute permitted a creditor to file an ex parte petition for a writ of attachment, which was then issued by a state court clerk and executed by a county sheriff. *Id.* at 924–25, 102 S.Ct. at 2746–47. In holding that the attachment constituted state action, the Supreme Court outlined a two-part approach:

First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible. In *Sniadach* [*v. Family Finance Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969) ], *Fuentes* [*v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) ], [*Mitchell v.*] *W.T. Grant* [416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974) ], and *North Georgia* [*Finishing v. Di-Chem*, 419 U.S. 601, 95 S.Ct. 719, 42

L.Ed.2d 751 (1975) ], for example, a state statute provided the right to garnish or to obtain prejudgment attachment, as well as the procedure by which the rights could be exercised. Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State. Without a limit such as this, private parties could face constitutional litigation whenever they seek to rely on some state rule governing their interactions with the community surrounding them.

*Id.* at 937, 102 S.Ct. at 2753–54. The Court concluded that the creditor acted under color of state law because he used a state-created attachment procedure under which state officials attached property on the ex parte application of the creditor.

The first prong, or state causation requirement,[2] of the *Lugar* approach requires that the deprivation be caused by the exercise of some state-created right or privilege, by a rule of conduct imposed by the state, or by a person for whom the state is responsible. 457 U.S. at 937, 102 S.Ct. at 2753–54. In *Lugar*, the Virginia statute outlining the procedural scheme for prejudgment seizure satisfied this prong. *See id.* at 941, 102 S.Ct. at 2755–56; *see also Buller v. Buechler*, 706 F.2d 844, 848 (8th Cir.1983). In the present case, the plaintiffs argue that both the Act and the involvement of the deputy sheriff satisfy this prong. Defendant Neil Hartigan, the Attorney General of Illinois, argues that the Act does not fulfill the first prong of *Lugar* because Weiszmann's use of a state officer violated the Act. Weiszmann and Cambridge Court agree with Hartigan that

**2.** We use the term "state causation" to refer to the requirement that the deprivation be caused by something attributable to the state or by someone for whom the state is responsible. The Second Circuit refers to this part as "state action," *see Dahlberg v. Becker*, 748 F.2d 85, 89 & n. 3 (2d Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1845, 85 L.Ed.2d 144 (1985), but since the Supreme Court said in *Lugar* that the two parts together constitute "state action," we prefer not to refer to both one part and the whole by the term "state action." *See Lugar,* 457 U.S. at 936–39, 102 S.Ct. at 2753–55. Our use of the term "state causation" is merely for convenience, and it reflects no more or less than the first prong of the *Lugar* approach.

the involvement of the deputy sheriff violated the Act (a position we doubt they argued in the state court hearing), and they also argue that the seizure of Greco's personal property violated the provisions of the Act and thus cannot give rise to a section 1983 action. The district court agreed with the defendants and entered summary judgment against Greco and Buffet on Count III.

A private party's *misuse* of a state statute does not reflect a state cause. *Lugar,* 457 U.S. at 940–41, 102 S.Ct. at 2755–56. When a private party, in violation of a state statute, deprives another party of property, that deprivation obviously cannot constitute conduct fairly attributable to a state rule or decision. *Id.* at 940, 102 S.Ct. at 2755. In the present case, the seizure of Greco's personal property violated the Act. The Illinois statute specifically provides that "in no case shall the property of any other person, although the same may be found on the premises, be liable to seizure for rent due from such tenant." Ill.Rev.Stat. ch. 110, § 9–301 (1983). Since Buffet, and not Greco, was the tenant, the Act authorized Weiszmann to distrain only Buffet's property. The seizure of Greco's property constituted an act "unlawful under state law" rather than an act under color of state law. *See Lugar,* 457 U.S. at 940, 102 S.Ct. at 2755; *Loyd v. Loyd,* 731 F.2d 393, 398–99 (7th Cir.1984). The Act therefore does not satisfy the state causation prong of *Lugar* for Greco's claim.

The defendants also argue that the use of a deputy sheriff to serve the distress warrant violated the Act and thus precludes the Act from supplying the state causation portion of the *Lugar* test. The language of the Act has remained virtually unchanged since Abraham Lincoln practiced law in Illinois, *see* Ill.Rev.Stat. ch. LX, § 7 (1845), and cases discussing the Act frequently disclose the role of a sheriff or constable in serving the distress warrant. *See, e.g., Cottrell v. Gerson,* 371 Ill. 174, 176, 20 N.E.2d 74, 76 (1939) (constable);

*First National Bank of Joliet v. Adam,* 138 Ill. 483, 490 (1891) (constable); *Lehndorff USA (Central) Ltd. v. Cousins Club, Inc.,* 40 Ill.App.3d 875, 876, 353 N.E.2d 171, 173 (1976) (Cook County sheriff). *See also* Schuessler, *Ejectment, Forcible Entry and Detainer, and Distress or Distraint,* 1960 U.Ill.L.F. 115, 136 (1960) (suggesting that Illinois law permits a landlord to issue the distress warrant to a bailiff or constable). Nonetheless, *USA I Lehndorff Vermoegensverwaltung v. Cousins Club, Inc.,* 64 Ill.2d 11, 14–17, 348 N.E.2d 831, 832–33 (1976), provides the only authoritative interpretation of the Act by the Illinois Supreme Court. In *Cousins Club,* the Illinois Court rejected a tenant's challenge to the constitutionality of the state involvement after the landlord seized the property and filed the warrant. The court interpreted the Act as a landlord's self-help remedy that codified and restricted landlords' common law right to distress for rent. Moreover, in distinguishing cases in which other courts had found attachment statutes unconstitutional, the Illinois Supreme Court noted that in those cases a sheriff either seized the property or was otherwise involved in the seizure. *See id.,* 64 Ill.2d at 17, 348 N.E.2d at 833. Thus the language and the reasoning of the *Cousins Club* opinion clearly suggests that the policy of the State of Illinois is for landlords, and not state agents, to effect the distraint. Given the Illinois Supreme Court's interpretation of the Act, the active involvement of a deputy sheriff or other state agent in seizing a tenant's property violates the Act and voids any judgment based on the seizure. *See Marken Real Estate & Management Co. v. Adams,* 56 Ill.App.3d 426, 429–30, 14 Ill.Dec. 139, 141–42, 371 N.E.2d 1192, 1194–95, (1977). Weiszmann's use of a deputy sheriff to serve the warrant violated the policy of the state and this misuse of the Act cannot satisfy the first prong of the *Lugar* approach. The district court properly refused to reach the issue of the statute's constitutionality.[3]

---

**3.** Since defendant Hartigan was joined only to defend the constitutionality of the Act, the dis-

trict court properly granted summary judgment for Hartigan.

■ The plaintiffs also argue that the first half of the *Lugar* test is automatically satisfied when a private party acts jointly with a state official to effect the deprivation. They suggest that in the present case the two parts of the *Lugar* analysis "collapse into each other" because Weiszmann obtained significant aid from both a deputy sheriff and a Palatine police officer. *See Lugar,* 457 U.S. at 937, 102 S.Ct. at 2753–54. Although the mere presence or minor role of a state actor does not automatically satisfy the state causation requirement of *Lugar,* we agree that the significant involvement of a deputy sheriff in this case precluded a holding that Weiszmann, Cambridge, and Galloy did not act under color of law.

The holding and reasoning of *Lugar* imply that the mere presence or perfunctory role of a state official does not collapse the two prongs into one. The Supreme Court did suggest, as the plaintiffs here argue, that the two parts (state causation and state actor) "collapse into each other when the claim of a constitutional deprivation is directed against a party whose official character is such as to lend the weight of the State to his decisions." *Id.* The parts diverge, the Court said, when the plaintiff directs his constitutional claim "against a party without such apparent authority, *i.e.,* against a private party." *Id.* In *Lugar,* as in the present case, the plaintiff sought damages from a private party⁴ and, even though a clerk issued the writ and a sheriff executed it, the Court analyzed the two prongs separately. The Court found the first prong satisfied not by the roles of the clerk and sheriff but by the Virginia attachment statute; if the involvement of the state agents were enough to make the creditor a state agent, the Court would not

have had to look to the statute to satisfy the first prong. *See Winterland Concessions Co. v. Trela,* 735 F.2d 257, 262 (7th Cir.1984) (first prong not satisfied when state officers do no more than simply discharge the duties of their offices).

■ Although minor involvement by a state actor does not collapse the two parts into one, the *Lugar* opinion clearly suggests that the Supreme Court did not intend to abolish the *Monroe v. Pape* abuse of authority doctrine. *See Lugar,* 457 U.S. at 940, 102 S.Ct. at 2755; *Monroe v. Pape,* 365 U.S. 167, 184–87, 81 S.Ct. 473, 482–84, 5 L.Ed.2d 492 (1961). In fact, the Court cited *Monroe v. Pape* as an example of when the two prongs of *Lugar* (state causation and state actor) collapse into one. *Lugar,* 457 U.S. at 937, 102 S.Ct. 2753–54. Thus, even if a private party misuses a state statute, the deprivation can still be under color of state law if the authority of state officials puts the weight of the State behind the private decision.

■ *Howerton v. Gabica,* 708 F.2d 380, 383–85 (9th Cir.1983), provides an example of private misuse of a state law that nonetheless constitutes state action. In *Howerton,* police officers actively assisted a landlord in effecting a legally deficient eviction notice. *Id.* at 381–82. The Ninth Circuit held that when private parties deliberately cloak themselves with the authority of the state, they have proceeded under color of state law and may be liable under 42 U.S.C. § 1983. The court held that the landlords' violation of the eviction statute did not preclude a finding of state action because their use of the police, and not the state statute, put the weight of the state behind their private decision to evict. *See id.,* at

The plaintiffs also argue that this court should reverse the district court with respect to the Act so that on remand the plaintiffs could try to prove that state officers customarily serve distress warrants. In the district court, the plaintiffs offered no proof, or even an allegation, that the service of the distress warrant by a deputy sheriff resulted from an existing county policy. *See generally Monell v. New York City Department of Social Services,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1977).

Since the plaintiffs failed to submit evidence of this alleged county policy or custom, the district court properly granted summary judgment on this issue. *See Rodgers v. Lincoln Towing Service, Inc.,* 771 F.2d 194, 201–02 (7th Cir.1985).

4. In the present case, the plaintiffs also name Dan Doe, an unknown Cook County Deputy Sheriff, as a defendant, but he has not yet been identified or served process.

384 n. 9. The case therefore fell within the abuse of discretion doctrine of *Monroe v. Pape* rather than the state-created right approach outlined in *Lugar.* "At some point, as police involvement becomes increasingly important," the court said, "repossession by private individuals assumes the character of state action." *Howerton,* 708 F.2d at 383. Thus a private party acting jointly with a state official who abuses his authority also acts under color of state law and is subject to section 1983 liability. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 1605–06, 26 L.Ed.2d 142 (1970); *see also Dahlberg v. Becker,* 748 F.2d 85, 89–92 (2d Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 1845, 85 L.Ed.2d 144 (1985).

■ In the present case, the record reveals that the Palatine police officer entered the lounge but stood near the door and never spoke to Greco. A police agreement to "stand by in case of trouble" does not convert a private repossession into state action. *See United States v. Coleman,* 628 F.2d 961, 964 (6th Cir.1980); *cf. Harris v. City of Roseburg,* 664 F.2d 1121, 1127 (9th Cir.1981) (repossession converted into state action when police officer so intimidated debtor as to cause him to refrain from exercising legal right to resist repossession). Since the Palatine police officer did no more than this, his mere presence did not make Weiszmann a state actor. *See Wright v. National Bank of Stamford,* 600 F.Supp. 1289, 1294–97 (N.D.N.Y. 1985).

■ The deputy sheriff's role in the distraint presents more difficult questions. First, the record does not reveal whether the deputy was on-duty or off-duty when he served the warrant. If he was on-duty, his actions, viewed in the light most favorable to plaintiff, certainly constitute more than an agreement to stand by in case of trouble. Viewed in this light, the evidence shows that the deputy met Weiszmann at Galloy's Burger King just before serving the warrant. The deputy suggested calling the Palatine Police Department to have an officer present, and Galloy placed the call.

At the lounge, the deputy approached Greco, identified himself, and served the warrant. Finally, the deputy told Greco that the distraint was legal, that Greco had to leave the cash in the register, and that Greco should take his personal belongings and vacate the premises. Greco affidavit, Weiszmann deposition at 82–84. On a summary judgment motion, we must assume the deputy sheriff, rather than passively observing the seizure, actually effected it for the landlord. Such an active involvement by an on-duty deputy sheriff constitutes state action. *See Howerton,* 708 F.2d at 383–85; *Harris,* 664 F.2d at 1127. More importantly, the evidence, viewed in the light most favorable to plaintiffs, supports plaintiffs' claim that Weiszmann, Cambridge, and Galloy conspired with the deputy sheriff to deprive Buffet and Greco of their property without process. Therefore the private parties may be fairly said to be state actors for purposes of section 1983. *See Mark v. Furay,* 769 F.2d 1266, 1272–74 (7th Cir.1985); *cf. Moore v. Marketplace Restaurant, Inc.,* 754 F.2d 1336, 1352–53 (7th Cir.1985) (no state action when no direct or circumstantial evidence of conspiracy).

This conclusion does not end our analysis, however, because the record contains evidence suggesting that the deputy sheriff was off-duty when he served the warrant. Of course, being off-duty does not preclude him from acting under color of state law. *See Layne v. Sampley,* 627 F.2d 12, 13 (6th Cir.1980); *cf. Weinrauch v. Park City,* 751 F.2d 357, 360–61 (10th Cir.1984) (owner of towing service not acting under color of state law when he pursued car taken from impound lot without payment of towing fee). This court has held that off-duty officers acted under color of state law when they identified themselves as police officers, carried their badges and guns, and were required by department regulations "to be always subject to duty." *Davis v. Murphy,* 559 F.2d 1098, 1101 (7th Cir.1977); *see also Stengel v. Belcher,* 522 F.2d 438, 441 (6th Cir.1975), *cert. dismissed as improvidently granted,* 429 U.S. 118, 97 S.Ct.

514, 50 L.Ed.2d 269 (1976). Similarly, an off-duty officer working as a bank "security teller" acted under color of state law when he stopped a bank customer, identified himself as a police officer, and detained the customer. *See Traver v. Meshriy,* 627 F.2d 934, 937–38 (9th Cir.1980). In *Traver,* the evidence also showed that using off-duty officers as "security tellers" was part of the police department's secondary hiring program and that the officer believed that if a crime were committed at the bank his duty lay with the department and not with the bank. The record in the present case lacks conclusive evidence on the issue whether the deputy, if off-duty, could fairly be considered a state actor. *See Bonsignore v. City of New York,* 683 F.2d 635, 638–39 (2d Cir.1982) (off-duty police officer did not act under color of state law when he used police revolver to shoot wife); *Davis v. Carson Pirie Scott & Co.,* 530 F.Supp. 799, 802–03 (N.D.Ill.1982) (mere fact that person was "special police officer" did not convert his off-duty activities to state action). *But see Hanson v. Larkin,* 605 F.Supp. 1020, 1023 (D.Minn. 1985) (off-duty police officer in uniform is state actor); *Brandon v. Allen,* 516 F.Supp. 1355, 1360 (W.D.Tenn.1981) (off-duty policeman acted under color of state law when he displayed his official police identification and used his police revolver), *rev'd on other grounds,* 719 F.2d 151 (6th Cir.1983), *aff'd,* — U.S. —, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985) (reversing the court of appeals). But that consideration is not a major concern here since, viewing the evidence in the light most favorable to plaintiffs, the deputy sheriff was on-duty

and took an active role in the seizure. Viewed in this light, the evidence shows that Weiszmann, Cambridge, and Galloy acted jointly and pursuant to a conspiracy with the deputy sheriff to deprive Greco and Buffet of property without due process of law.

■ Although the district court erred when it held Weiszmann, Cambridge, and Galloy did not act under color of state law, we affirm the summary judgment because postdeprivation remedies provided all process that was due. An unauthorized intentional deprivation of property by a state employee does not constitute a due process violation if the state provides a meaningful postdeprivation remedy. *See Hudson v. Palmer,* — U.S. —, 104 S.Ct. 3194, 3204, 82 L.Ed.2d 393 (1984). In the present case, Greco could have appeared at the distress for rent hearing and argued that the seizure was unlawful.[5] Even if Greco did not know the time and place of the hearing, he could have brought a tort action for conversion. *See generally Monroe County Water Cooperative v. City of Waterloo,* 107 Ill.App.3d 477, 480–81, 63 Ill.Dec. 315, 317–18, 437 N.E.2d 1237, 1239–40 (1982) (defendant's exercise of control over chattel in a manner inconsistent with plaintiff's right of possession constitutes conversion); *cf. Rodgers v. Lincoln Towing Service, Inc.,* 771 F.2d 194, 198–99 (7th Cir.1985) (state tort claims against police officer for false imprisonment and malicious prosecution preclude section 1983 claim). Access to a tort claim precludes Greco and Buffet from using section 1983 to compensate them for their injuries.[6]

---

**5.** Greco was never served with a summons for the distress action, but on June 18, 1980, twelve days before the hearing, Greco's attorney wrote Weiszmann and demanded the return of Greco's personal property. That letter referred to the distress action by its title and docket number, information the attorney or Greco could have obtained only from the file at the Circuit Court Clerk's office. That file also gave the time and place of the hearing. Therefore, as the district court held, Greco had an opportunity to appear in the state court proceeding if he had wanted to appear.

**6.** Our holding should not be read to imply that Greco and Buffet waived any constitutional claim by failing to appear at the state court hearing. We express no opinion on that issue. *But see Patsy v. Board of Regents of the State of Florida,* 457 U.S. 496, 516, 102 S.Ct. 2557, 2568, 73 L.Ed.2d 172 (1982) (plaintiff need not exhaust state administrative remedies before bringing section 1983 action); *Schultz v. Baumgart,* 738 F.2d 231, 237 (7th Cir.1984) (failure to take advantage of predeprivation process may constitute waiver of procedural rights). Rather, we hold that the postdeprivation remedies satisfied the requirements of due process. *See Par-*

We affirm the summary judgment on Counts III and IV with respect to the seizure of Greco's and Buffet's property on June 13, 1980.

### III.

■ The plaintiffs also alleged in Counts III and IV that Galloy entered an unauthorized appearance on behalf of Buffet in the distress for rent proceeding and stipulated to a judgment against Buffet. In Count IV, plaintiff alleged that this appearance resulted from a conspiracy among Galloy, Weiszmann, and Cambridge to deprive Greco and Buffet of their property without due process of law. The plaintiffs do not allege that the deputy sheriff participated in the state court proceeding. Viewing the evidence in the light most favorable to the plaintiffs, Galloy misled the state judge and thus caused the judge to conclude that he had jurisdiction over the corporation. The plaintiffs do not allege that Galloy and Weiszmann conspired with the state judge to deprive Buffet and Greco of their property. *Cf. Dennis v. Sparks*, 449 U.S. 24, 28, 101 S.Ct. 183, 186, 66 L.Ed.2d 185 (1980) (private parties acted under color of state law when they conspired with state judge to deprive plaintiff of property without due process). Rather plaintiffs allege a private misuse of the state court procedure. *See Dahlberg*, 748 F.2d at 90–91. A private party's misuse of the courts, without more, does not constitute state action for purposes of section 1983. *See Trela*, 735 F.2d at 262. The district court properly granted summary judgment on Greco's and Buffet's claims that the defendants deprived them of property without due process when Galloy caused the state judge to find jurisdiction over the corporation.

### IV.

The plaintiff also brought two section 1983 claims against the Village of Palatine and the Village Trustees. In the first count, the plaintiffs alleged that the Village and its Trustees deprived Buffet of property without due process by transferring Buffet's liquor license to Galloy without first giving Greco notice and a hearing. The second count alleged that Galloy and the Trustees conspired to deprive Buffet of its liquor license without due process of law. The district court granted summary judgment on these counts on the ground that postdeprivation remedies provided all process that was due.

■ A section 1983 action based on a procedural due process claim requires a two-part inquiry: whether the plaintiffs were deprived of a property interest, and, if so, whether they received the process they were due. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428, 102 S.Ct. 1148, 1153–54, 71 L.Ed.2d 265 (1982). The defendants do not argue that a restaurant owner's interest in having his liquor license renewed is not a property interest, *but see Baer v. City of Wauwatosa*, 716 F.2d 1117, 1121–22 (7th Cir.1983) (suggesting that a license is only a property interest for the term of the license), and we therefore turn to the second issue—what process was due.

■ *Parratt* and *Logan* set the parameters for this case. *Parratt* teaches that due process does not require a predeprivation hearing if such a hearing could not be meaningful. *See Vail v. Board of Education of Paris Union School District No. 95*, 706 F.2d 1435, 1447 (7th Cir.1983) (Eschbach, J., concurring), *aff'd*, 466 U.S. 377, 104 S.Ct. 2144, 80 L.Ed.2d 377 (1984). In *Parratt*, for example, the Supreme Court held that it would be impractical, if not impossible, to provide a hearing before a random and unauthorized act of a state employee deprived the plaintiff of his property. *See Parratt*, 451 U.S. at 541, 101 S.Ct. at 1916. In such cases, the existence of an adequate postdeprivation state remedy satisfies due process. *Id.* at 541–43, 101 S.Ct. at 1916–17; *see also Wolf-Lillie v. Sonquist*, 699 F.2d 864, 871 (7th Cir.1983). A postdeprivation remedy does not satisfy due process, however, if a predeprivation hearing is practical *or* if the postdeprivation remedy is inadequate. *See Logan*, 455

*ratt*, 451 U.S. at 543–44, 101 S.Ct. 1908, 1916–17, 68 L.Ed.2d 420.

U.S. at 435–37, 102 S.Ct. at 1157–59; *see also Schultz v. Baumgart,* 738 F.2d 231, 237–38 & n. 8 (7th Cir.1984) (predeprivation hearing possible); *Parrett v. City of Connersville, Indiana,* 737 F.2d 690, 697 (7th Cir.1984) (postdeprivation remedy inadequate), *cert. denied,* —— U.S. ——, 105 S.Ct. 828, 83 L.Ed.2d 820 (1985). Thus in *Logan,* in which an established state procedure deprived the plaintiff of his protected interest, the existence of an independent tort action did not suffice. 455 U.S. at 436, 102 S.Ct. at 1158. Since the state was in a position to provide a meaningful predeprivation hearing, the Due Process Clause required the state to do so. *Id.; Hudson v. Palmer,* 104 S.Ct. at 3203–04.

■ In the present case, the defendants argue that Buffet was not entitled to a predeprivation hearing because the renewal of the license in Galloy's name did not result from an established state procedure. Rather, the Village defendants suggest (and the record supports them), that the Village Board had no procedure designed to handle the unique circumstances that it confronted. This argument misses the focus of *Parratt* and *Logan.* The controlling inquiry is *not* whether the deprivation resulted from an established state procedure but rather whether predeprivation process was practical. *See Hudson,* 104 S.Ct. at 3204. A state need not provide predeprivation process for a deprivation caused by an individual employee's negligent deprivation "because the *State* cannot possibly know in advance of a negligent deprivation of property." *Id.* (emphasis in original). A state can foresee a deprivation effected pursuant to an established state procedure, and thus must provide predeprivation process. In this case, if the Village Trustees should have known that the aberration from established procedures would result in a deprivation and thus could have practically provided predeprivation process, the Due Process Clause required it to provide such process.

The uncontroverted facts of this case establish that a predeprivation hearing was impractical because the Village Trustees did not realize they were depriving Buffet of a property interest. Buffet acknowledges that the Trustees believed that Buffet had filed for bankruptcy, that Buffet had not filed a license renewal application, and that Buffet had no possible viable financial future. Appellants' Reply Brief at 1. Buffet argues, however, that the Village Trustees were not justified in relying on Galloy's representations because Galloy had an obvious conflict of interest and because the statements of Galloy could not establish his authority to speak for Buffet. We find neither argument persuasive.

When Galloy approached the Village about renewing Buffet's liquor license in his name, only seven days remained on the corporation's license. Even viewing the evidence in the light most favorable to Buffet, as we must in this procedural context, the evidence shows that the Trustees gave Galloy not the seven remaining days on the Buffet license but rather a license for the upcoming licensing year. Transcript of Excerpts of June 23, 1980 Board Meeting, Bogenberger Deposition at 31–33. Furthermore, although the record is not clear why, the Village Attorney erroneously believed that Buffet had not filed an application to renew its license and he informed the Trustees of this "fact." Since the Board knew that Buffet had closed and believed that Buffet had not filed for a license renewal, there was no apparent conflict of interest that should have caused the Trustees to think that Galloy did not represent the corporation.

Buffet also argues that the Village Trustees could not rely on Galloy's assertions of authority to speak for Buffet. Citing *Malcak v. Westchester Park District,* 754 F.2d 239, 245 (7th Cir.1985), Buffet contends that Illinois law requires a third party dealing with an agent "to verify both the fact and extent of the agent's authority." Here, however, Galloy had apparent authority to speak for Buffet. Buffet's renewal application for the prior year (1979) listed Galloy as a fifty percent shareholder and was signed by Greco and Galloy. Thus the prior actions of the corporation, and not merely Galloy's own statements to the Vil-

lage in June of 1980, held Galloy out as an agent of the corporation. *See Wing v. Lederer*, 77 Ill.App.2d 413, 417, 222 N.E.2d 535, 538 (1966) (agent has apparent authority such "as a reasonably prudent man, exercising diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess"). Furthermore, the closing of Greco's Restaurant tended to confirm Galloy's representations rather than suggest a conflict that would have required further investigation of Galloy's authority. *Cf. Schoenberger v. Chicago Transit Authority*, 84 Ill.App.3d 1132, 1138, 39 Ill.Dec. 941, 405 N.E.2d 1076, 1081 (1980) (circumstances suggested that agent did not have the authority he claimed to possess).

Since the Village did not know that renewing Buffet's license in Galloy's name would cause a deprivation, the Village could not foresee the need for predeprivation process. *See Hudson*, 104 S.Ct. at 3203; *cf. Vail*, 706 F.2d at 1440 (predeprivation process "neither practical nor appropriate ... where clearly established state policies were involved and ignored due to negligence or otherwise"). Therefore the existence of an adequate postdeprivation remedy would provide all the process Buffet was due.

By June 27, 1980, Greco had discovered that Galloy had renewed the Buffet liquor license in Galloy's name. Greco, individually and on behalf of Buffet, could have appealed the Palatine Board's decision to the Illinois Liquor Control Commission. Ill.Rev.Stat. ch. 43, ¶ 149, 153 (1983). *See City of Wyoming v. Liquor Control Commission of Illinois*, 48 Ill.App.3d 404, 409, 6 Ill.Dec. 258, 262, 362 N.E.2d 1080, 1084 (1977) (classifying refusal to renew liquor license as within definition of revocation for purposes of Ill.Rev.Stat. ch. 43, ¶ 149). Pending appeal (and assuming Buffet regained possession of its premises), Buffet could have continued to serve liquor pursuant to the terms of its prior license.[7] *See* Illinois Liquor Control Commission Rule 23. Of course, Buffet correctly points out that the State Commission could not award damages, but, since the state procedure would have allowed Buffet to keep its license until the appeal was decided, Buffet would have suffered no monetary damages. Renewal of its license on appeal would have made Buffet whole. *See Parratt*, 451 U.S. at 544, 101 S.Ct. at 1917–18 (state remedies satisfied due process requirement even though they did not provide as much relief as a section 1983 action). In addition, it may have had an action for breach of fiduciary duty or conversion of corporate assets against Galloy.

The postdeprivation state remedies were adequate and we therefore affirm the summary judgments on Counts I and II.

## V.

The judgment of the district court is AFFIRMED.

---

7. Buffet argues that an appeal to the Illinois Liquor Control Commission is an inadequate remedy because Palatine, as a home rule community, could have had a law restricting the appeal to one on the record before the Palatine Village Board. *See* Ill.Rev.Stat. ch. 43, ¶ 153 (1983). Since Greco did not attend the Village meeting, his side of the story is not on the record and the decision to give Galloy the license would thus be supported by the record. Buffet argues that, since on an appeal from a summary judgment this court must view the evidence in the light most favorable to the nonmoving party, the Village's failure to submit evidence that it did not have an ordinance precluding de novo review requires this court to assume that the Village had such an ordinance. This point is not well-taken.

The Palatine Liquor Ordinances outline the procedures the Palatine Liquor Commission must follow in granting, renewing, revoking, or suspending liquor licenses. The only statement concerning appeals refers to revocation and suspension proceedings and provides that "[a]ppeals shall be taken to the Illinois Liquor Control Commission and the circuit court in the manner provided by law." Palatine Ordinances § 3–39. We find no ordinance restricting appeals to a review of the record from the local proceedings, and, unless Palatine had such an ordinance, Illinois law requires that the issue "be tried de novo by the State Commission." Ill.Rev.Stat. ch. 43, ¶ 153 (1983). Absent any evidence from Buffet to the contrary, the only reasonable inference drawn from the Palatine Liquor Ordinances is that Palatine had no law restricting the state review to the record from the Palatine proceeding.