**Nydia TAVAREZ and Manny Tavarez, d/b/a La Nydia Grocery, Plaintiffs-Appellants,**

v.

**Michael O'MALLEY, et al., Defendants-Appellees.**

No. 86–2501.

United States Court of Appeals, Seventh Circuit.

Argued April 3, 1987.

Decided Aug. 13, 1987.

Rehearing and Rehearing En Banc Denied Sept. 24, 1987.

Thomas Grippando, Chicago, Ill., for plaintiffs-appellants.

Karen J. Dimond, Asst. State's Atty., Chicago, Ill., Michael W. Rathsack, Rathsack, O'Brien, Redding & Hyde, Chicago, Ill., for defendants-appellees.

Before BAUER, Chief Judge, and WOOD and POSNER, Circuit Judges.

POSNER, Circuit Judge.

The proprietors of a grocery store in Schiller Park, a town in Cook County, Illinois, brought a damage suit under section 1 of the Civil Rights Act of 1871, now 42 U.S.C. § 1983, claiming that the defendants—Cook County, and various employees of the county and of Schiller Park—had deprived them of property without due process of law. The district judge granted summary judgment for the defendants, 635 F.Supp. 1274 (N.D.Ill.1986), so we must construe the facts as favorably to the plaintiffs as the record will permit.

On November 21, 1983, a gas heater in the Tavarezes' grocery store malfunctioned and gave off carbon monoxide that injured several people in the store, including Mrs. Tavarez. Defendant O'Malley, an inspector employed by the Cook County Department of Environmental Control, arrived on the scene shortly, as did the Schiller Park defendants—three police officers and the town's health officer, McCampbell. After shutting off the malfunctioning heater, one or more of the defendants (it is unclear, and probably irrelevant, which ones) placed Cook County coroner seals on the doors of the store, although no one had died. Each seal states, "Any person breaking or mutilating this seal or entering these premises will be prosecuted to the full extent of the law." It took more than four weeks for the Tavarezes to regain access to the building. During that time water pipes burst because of freezing temperatures, causing damage to fixtures and equipment; and perishable inventory perished—either spoiled, or damaged by water, or both. The long shutdown also impaired the store's goodwill. The Tavarezes lease rather than own the grocery store, and the nature of their interest in the contents of the store is undisclosed; but the defendants do not dispute that the injuries of which the Tavarezes complain are the result of a deprivation of property within the meaning of the Fourteenth Amendment.

On the day the store was sealed, Mr. Tavarez asked McCampbell how he could get into the store and McCampbell replied that Tavarez would have to speak to the Director of the Cook County Department of Environmental Control, Mr. Molé, another defendant. The Tavarezes went to see

Molé the next day. O'Malley was also present at the meeting. After emphasizing to the Tavarezes that they would be committing a crime if they entered the store while the seals were on it, Molé told them they could enter once O'Malley finished his investigation. O'Malley chimed in that he wasn't the fastest investigator in the world—a statement not motivated by false modesty. Molé told the Tavarezes that he would get back in touch with them in a week.

The week came and went, without word from Molé. The Tavarezes tried to call him, but he neither took nor returned their calls. Another week went by. Finally Mrs. Tavarez went to Molé's office, where he told her that she and her husband could enter the store when they got a statement from the landlord promising that he would fix the heater. Molé even called the landlord and asked him to write the letter, which the landlord agreed to do. Mrs. Tavarez fetched the letter from him and took it to Molé's office—all on the same day. The next day Molé told her that the letter was no good because it didn't say when the repairs would be completed. Mrs. Tavarez went back to the landlord and asked him to specify a completion date, but he refused.

Three weeks had elapsed since the sealing of the store. Mr. Tavarez went to Molé and asked him again what the Tavarezes had to do to be allowed to reenter it. Molé said the decision was not his, but Schiller Park's. (The landlord had also gone to Molé to find out how he could get into the store to repair the heater, but Molé had said, "At this point I really don't know what to tell you. It is still under investigation. I cannot authorize you to get in there.") A week later the Schiller Park police gave Mr. Tavarez the keys to his store back.

The district judge granted summary judgment for Cook County because there is no county policy of sealing dangerous premises without notice and an opportunity for a hearing in advance, neither of which was provided here. The only Cook County ordinance we have found that governs the sealing of dangerous premises requires these procedural safeguards, see Cook Cty. Ill.Ordinances, ch. 16, § 16–5.5–3(b), and neither Molé nor any of the other defendants was authorized to omit them. Schiller Park has no ordinance relating to the sealing of dangerous premises, so while the Schiller Park employees were not acting with any explicit legal authority, neither were they acting in violation of an explicit rule, as the Cook County employees may have been ("may have been," not "were," because the ordinance we cited may be limited to hazards resulting from air pollution). The district judge dismissed the individual defendants precisely because their acts were unauthorized, which in the judge's view made notice and a predeprivation hearing infeasible.

■ The Tavarezes were deprived of the use of their property for a month, and all agree that the deprivation, although not permanent (except with regard to the spoilage and the water damage), was sufficient to trigger the Fourteenth Amendment's requirement of due process of law. See *Sutton v. City of Milwaukee*, 672 F.2d 644, 645 (7th Cir.1982). However, the malfunctioning of the heater was an emergency, and nothing in the Constitution forbade the defendants to evacuate the store, and to prevent anyone from entering it until the source of the potentially lethal fumes was found and corrected, without going through the formality of notice and a hearing, see, e.g., *Board of Regents v. Roth*, 408 U.S. 564, 570 n. 7, 92 S.Ct. 2701, 2705 n. 7, 33 L.Ed.2d 548 (1972)—an obviously ridiculous suggestion which the Tavarezes do not make. The constitutional problem arises from the inexplicable bureaucratic delays after the heater was turned off. It may well have been prudent to keep customers out of the store until the heater was fixed, but to keep out the Tavarezes and the landlord—the people with the strongest interest in getting the heater fixed as soon as possible—was not only unreasonable but stupid and even dangerous. Even more clearly, there was no reason not to give the Tavarezes a prompt opportunity to show that they were entitled to reenter the premises because the emer-

gency had passed and no state or local law authorized the defendants to keep them out once it had passed. The argument that the Schiller Park defendants were authorized to seal the premises is thin; they acknowledge that Schiller Park has no ordinance authorizing sealing and no seals and that the seals affixed were Cook County seals. Anyway the issue is not the initial sealing of the premises but the refusal to let the Tavarezes in after the emergency ended. The Cook County defendants' argument that as they had no authority to emplace the seals in the first place, *a fortiori* they had no authority to remove them even to the extent of allowing only the Tavarezes and the landlord to enter, is an effective parody of legal reasoning but is otherwise unworthy of comment.

Some kind of hearing could have been provided to the Tavarezes shortly after the premises were sealed, and if it had been it would have quickly demonstrated the utter lack of authority for the defendants' blocking the Tavarezes from entering their store and would thereby have averted substantial property damage. Perhaps no more need be said to show that there was a denial of due process, though whether any of the defendants is liable in damages is a separate question, of which more in due course.

The ground on which the district judge nevertheless dismissed the individual defendants derives from *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). A state prisoner owned a hobby kit of small value that the defendants—prison officials and guards—lost, allegedly through negligence. The Supreme Court held that (1) a deprivation of property can violate the due process clause of the Fourteenth Amendment even if caused by mere negligence, but (2) the requirements of due process can be satisfied, at least where the deprivation is the "result of a random and unauthorized act by a state employee," *id.* at 541, 101 S.Ct. at 1916, by postdeprivation remedies such as the right to bring a damage suit in state court. The first holding was later overruled. The second was reaffirmed in another case involving a prisoner's personal property. See *Hudson v.*

*Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984).

■ Read broadly, *Parratt* would greatly restrict the scope for suits under 42 U.S.C. § 1983 challenging deprivations of liberty or property without due process of law. If due process is satisfied by the ordinary state judicial remedies for torts, then not only would virtually no interference with property be actionable under section 1983, but even such classic constitutional-tort cases as that of the policeman who kills a suspect in order to bypass the cumbersome procedures of the criminal justice system would not be actionable, provided the killing was a tort under state law. These results have seemed unpalatable and various limiting principles have emerged. One is to emphasize the extent to which the due process clause of the Fourteenth Amendment has become a vehicle for the protection of substantive rights, as well as the right to fair procedure. If, for example, objections to police brutality are grounded in the Fourth Amendment's prohibition of unreasonable searches and seizures, the availability of postdeprivation procedure is irrelevant; it is not a procedure case. This approach is implicit in *Hudson v. Palmer*, which, in discussing the plaintiff's Fourth Amendment claim, does not mention *Parratt*.

■ Another limiting principle, of particular relevance to the present case, is to confine *Parratt* to cases (well illustrated by the facts of *Parratt* itself) where it just is not feasible for the state to provide a hearing before the deprivation occurs. We expressed support for this principle in *Greco v. Guss*, 775 F.2d 161, 170–71 (7th Cir. 1985), but we did so in dictum, and we relied heavily on *Parratt* and *Hudson*, which hold only that predeprivation hearings are not required when they would be infeasible—not that they are always required when they would be feasible. In other cases, illustrated by *Brown v. Brienen*, 722 F.2d 360, 365–66 (7th Cir.1983); *Altman v. Hurst*, 734 F.2d 1240, 1242 (7th Cir.1984) (per curiam), and *Del's Big Saver Foods, Inc. v. Carpenter Cook, Inc.*, 795

F.2d 1344, 1348–49 (7th Cir.1986), we have declined to hold that a predeprivation hearing is always required if feasible, pointing out that the Supreme Court has not always insisted on a predeprivation hearing in such circumstances. See *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). (*Greco* cites neither of these cases, nor *Brown* nor *Altman.*) We thought in *Brown v. Brienen* that the proper method for determining whether a predeprivation hearing must be offered is the cost-benefit approach of *Mathews v. Eldridge,* which asks essentially whether the particular procedural safeguard that the plaintiff is urging would save more in costs of legal error than it would add in administrative or other costs. See 424 U.S. at 335, 96 S.Ct. at 903.

If the dictum in *Greco* were authoritative, a conclusion that the Tavarezes were denied due process would be reached quickly. A predeprivation hearing was feasible, once the time of deprivation is moved forward (as we think it should be) from the initial sealing of the premises to the passing of the emergency some hours later. High-level officials were made aware of the sealing of the premises from the beginning and could readily have provided the Tavarezes with an opportunity for a brief, informal hearing on the propriety of denying them access to their property. Compare *Hudson v. Palmer, supra,* 468 U.S. at 534, 104 S.Ct. at 3204.

■ If the Tavarezes could have gotten a hearing by asking for it, and failed without excuse to ask, this would be a case where the right to a hearing had been waived. Cf. *Del's Big Saver Foods, Inc. v. Carpenter Cook, Inc., supra,* 795 F.2d at 1349–51. But whom were they to ask? Molé, the director of the county's environmental-control agency, and McCampbell, the Schiller Park health officer, between them prevented the Tavarezes—through an all-too-common bureaucratic version of the Alphonse-and-Gaston routine—from getting into the store for almost a month, without ever suggesting that the Tavarezes might obtain a hearing on their right to get in sooner. While in principle the Tavarezes could have applied to an Illinois state court for an order of mandamus requiring these defendants to remove the seals, see, e.g., *Taylor v. State Bd. of Education,* 56 Ill. App.3d 387, 390, 14 Ill.Dec. 324, 326, 372 N.E.2d 129, 131 (1978), Molé deflected the Tavarezes from pursuing any such remedy by leading them to believe that access was only a day or two away—if only they did this, or that.... It was cheaper, and must have seemed more likely to be effective, for the Tavarezes to play ball with Molé than to go to court and precipitate a confrontation with him. By the time the Tavarezes discovered otherwise the month had passed and the damage had been done.

■ Analysis becomes more complex if we follow the approach of *Brown v. Brienen,* but the conclusion is the same as it would be under the dictum in *Greco.* A predeprivation hearing would have been quick and cheap and would have enabled the Tavarezes, at little cost to themselves, the defendants, or anyone else, to regain the use of their premises. Not only they but their customers would have benefited, and no one would have been hurt. A tort suit against the defendants for damages would not have been a good substitute from a social standpoint for the predeprivation hearing even if such a suit would have made the Tavarezes whole—which is doubtful given the limited liability and extensive immunities of public officials to tort suits under Illinois law. See Ill.Rev.Stat. ch. 85, ¶¶ 2–109, 2–201, 2–202; *Barth by Barth v. Board of Education,* 141 Ill.App.3d 266, 272–74, 95 Ill.Dec. 604, 608–09, 490 N.E.2d 77, 81–82 (1986); *Breck v. Cortez,* 141 Ill. App.3d 351, 358–60, 95 Ill.Dec. 615, 620–621, 490 N.E.2d 88, 93–94 (1986). At best a damage suit would shift wealth from the defendants to the plaintiffs and deter lawless acts by these or other public officials, but it could not restore the use of the Tavarezes' premises during the month when the premises were sealed. No doubt most of its customers were able to satisfy their grocery needs at comparable cost elsewhere, but they must have suffered at least minor inconvenience, and in any event the damaged merchandise is a deadweight

social loss. We grant that the irrevocability of the loss is no more decisive in favor of a predeprivation hearing than the existence of irreparable harm is decisive in favor of (or against) the grant of a motion for a preliminary injunction. Cf. *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380 (7th Cir.1984). But it is a relevant factor; and though the overall social losses in this case undoubtedly were small, the cost of a hearing that would have prevented all or most of the losses would have been even smaller. So under the test of *Mathews v. Eldridge* the omission of that procedural safeguard did deny the Tavarezes due process of law.

■ All this assumes, of course, that the deprivation of property was not due to "a random and unauthorized act." This language in *Parratt* can be read in a narrow and in a broad way. Read narrowly it merely identifies the situation where a predeprivation remedy is infeasible because the officials authorized to grant such a hearing are unaware of the deprivation before it occurs. That was the situation in *Parratt* itself; it has not been shown to be the situation in this case. So far as appears, Molé and McCampbell were the senior officials responsible for dealing with hazardous premises; the fact that they may well have exceeded their authority under state law cannot by itself, as the district court seemed to think, exonerate them from liability under the Constitution. *Parratt* (on the narrow reading) does not place all *ultra vires* conduct beyond the reach of section 1983, but only conduct that occurs at such a low level of state or local government that it would be infeasible for the state to provide an opportunity for a hearing before the conduct occurred.

■ Read more broadly, the quoted language from *Parratt* places beyond the reach of section 1983 any loss that "is not a result of some established state procedure," 451 U.S. at 541, 101 S.Ct. at 1916, even if the loss might have been averted by a predeprivation hearing. Under this interpretation we would have to ask whether the procedure that the defendants followed in excluding the Tavarezes from their grocery store without giving them an opportunity for a hearing was an established state procedure. On this record, we cannot say it was not, merely because it was not expressly authorized by statute or ordinance. Molé and McCampbell appear to be the senior county and town officials (respectively) who have the practical if not necessarily the legal authority to establish procedures for dealing with hazardous premises. They cannot escape liability under section 1983 simply by exceeding the scope of their authority.

■ Even if there was a denial of due process in this case, however, it does not follow that all, or even any, of the defendants are liable for it. In particular we do not see how the Schiller Park policemen can be liable. All they did was affix the seals, and we have said that the initial sealing was a constitutionally permissible response to an emergency. It does not matter from a constitutional standpoint whether they were authorized by state (or local) law to do so; the function of section 1983 is to redress violations of federal, not state, law. See, e.g., *Kasper v. Board of Election Comm'rs*, 814 F.2d 332, 342 (7th Cir.1987); *Del's Big Saver Foods, Inc. v. Carpenter Cook, Inc.*, 795 F.2d at 1350; cf. *United States v. Janik*, 723 F.2d 537, 548–49 (7th Cir.1983). The Constitution was violated by the failure to remove the seals when the emergency passed, a failure in which the policemen were not implicated. Molé was primarily responsible for this failure and cannot be allowed to shift the blame to McCampbell, the Schiller Park health officer. McCampbell used Cook County seals, after all, and acted in conjunction with O'Malley, who is Molé's subordinate. The three acted in concert. Since, as a result of the Supreme Court's decision in *Monell v. New York City Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), liability under section 1983 cannot be based on the doctrine of respondeat superior, which would make a public agency liable for the intentional torts of its employees committed in the furtherance of their employment. Molé's conduct cannot be attributed auto-

matically to Cook County, another defendant. If, however, as head of the county's environmental-control agency, he "possess[ed] final authority to establish municipal policy with respect to the action ordered," then perhaps in environmental matters in Cook County he *was* Cook County, in which event the county was a proper defendant, too. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986). Whether Molé had such authority remains to be determined—indeed, further proceedings in the district court may cast the facts bearing on all the issues we have discussed in a quite different light. All we hold is that the facts that emerged in the summary judgment proceedings do not establish that the defendants have a right to judgment.

 We have left for last the Tavarezes' challenge to the refusal by the district judge to allow them to amend their complaint to state claims under the Fourth and Fifth Amendments and a claim for deprivation of "substantive due process" under the Fourteenth Amendment. Where as in this case permission by the judge is required to file an amended pleading, see Fed.R.Civ.P. 15(a), his decision to deny permission will not be reversed unless it can be said to be an abuse of discretion, see, e.g., *Wakeen v. Hoffman House, Inc.,* 724 F.2d 1238, 1244 (7th Cir.1983). The reason for this deferential standard is that such a decision depends on a multitude of considerations, such as the convenience of the parties, the reasons for delay, and the impact on the district court's management of its docket if the thrust or scope of the litigation is changed in midstream, that are far more accessible to the district judge than to appellate judges. There was no abuse of discretion here. The Tavarezes waited a year to move to amend their complaint, and when they did move they didn't bother to submit the proposed amendment. Nor is it obvious what they had to gain by multiplying the constitutional grounds of their case. The type of seizure that occurred here is remote from the Fourth Amendment's concern with unreasonable searches and seizures, cf. *Hudson v. Palmer, supra,* 468 U.S. at 540, 104 S.Ct.

at 3207 (concurring opinion), has nothing to do with any clause in the Fifth Amendment, and, so far as the due process clause of the Fourteenth Amendment is concerned, is objectionable only because it occurred without proper procedural safeguards. The fact that it may have violated state substantive law would not establish a denial of due process, for reasons stated earlier.

So the refusal to amend the complaint must stand. But as we think the judge erred in deciding at this early stage in the proceeding that the plaintiffs have no possible claim against any of the defendants, the judgment for the defendants must be reversed and the case remanded for further proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.